The UPJOHN COMPANY and the
Asgrow Florida Company,
Plaintiffs,

v.

AETNA CASUALTY AND SURETY
COMPANY and General Accident Insurance Company of America, Defendants.

No. K88–124 CA4.

United States District Court,
W.D. Michigan.

June 4, 1990.

On Motion for Reconsideration
Jan. 18, 1991.

Paul T. Sorensen, Warner, Norcross & Judd, Grand Rapids, Mich., Robert N. Sayler, Keith A. Teel, Eric C. Bosset, Gregg H. Levy, Rebecca Snow, Seth A. Tucker, Covington & Burling, Washington, D.C., for plaintiffs.

William J. Heaphy, Vandeveer, Garzia, PC, Grand Rapids, Mich., Charles W. Browning, Vandeveer, Garzia, PC, Detroit, Mich., L. Roland Roegge, John M. Kruis, Carol D. Carlson, Smith, Haughey, Rice & Roegge, PC, Grand Rapids, Mich., for defendants.

Robert J. Dugan, Rhoades, McKee, Boer, Goodrich & Titta, Grand Rapids, Mich., Barry R. Ostrager, Mary K. Vyskocil, Simpson, Thacher & Bartlett, New York City, for amicus Travelers Ins.

## OPINION

ENSLEN, District Judge.

This case is currently before me on plaintiffs Upjohn Company and Asgrow Florida Company's June 1, 1989 Motion for Partial Summary Judgment. This lawsuit stems from an insurance law dispute as to defense costs and indemnity related to environmental damage at a total of twenty-six (26) sites across the United States. Plaintiffs here—Upjohn Company and its subsidiary—("plaintiffs" or "Upjohn") are defendants or potential defendants in a series of private actions and administrative proceedings alleging environmental damage at these twenty-six sites. Defendants Aetna Casualty & Surety Company and General Accident Insurance Company of America sold to Upjohn comprehensive general liability policies allegedly covering the periods when the environmental damage occurred. Plaintiffs are clear that summary judgment is sought on their motion as to only one of the two major liability issues in this case—whether the insurance companies are obligated to defend Upjohn for various sites in the underlying environmental proceedings. Plaintiffs move this Court for partial summary judgment in their favor and for a declaration that defendants are responsible for past and future defense costs incurred in the underlying proceedings. In addition, defendant Aetna asserts that with regard to two issues ripe for decision at this time, the Court should grant summary judgment in defendants' favor. The first issue is whether a PRP letter addressed to the insured constitutes a "suit" under a comprehensive general liability policy, thus triggering the insurer's duty to defend. The second issue is whether the underlying matters seeking CERCLA response costs constitute a suit for "damages" under the policy, thereby requiring a defense.[1] Also for summary judgment, however, Aetna argues

---

1. Defendant Aetna has not made a cross motion

before me is defendant General Accident's December 13, 1989 motion for summary judgment on the issues of the duty to defend and to indemnify based on a late notice argument. Thus I will address plaintiffs' motion for partial summary judgment on the duty to defend issue only. I will analyze defendant General Accident's motion as to both the duty to defend and the duty to indemnify issue.

The reader should refer to both Appendix A and B for assistance in understanding the positions of the plaintiffs, two defendant insurance companies, and the relevant facts related to twenty-six different sites. Appendix A is primarily designed for use with the duty to defend issue. Appendix B is helpful on the duty to indemnify issue, as it is affected by the doctrine of late notice.

In settling these motions, the Court will first provide a background for this multi-party, multi-site lawsuit, setting forth the facts concerning the various insurance policies and then discussing the underlying proceedings: both administrative actions and four lawsuits. Following that, I will discuss two preliminary issues on the duty to defend question: 1) whether a PRP letter in an administrative procedure is equivalent of a complaint triggering a duty to defend in this context; and 2) whether clean up costs, technically an equitable remedy, are "damages" as defined under the relevant insurance policies. I will then apply these principles to the issue of Aetna's and then to General Accident's duty to defend plaintiffs. Finally, the Court will analyze defendant General Accident's duty to indemnify.

## BACKGROUND

### FACTS

#### *Policies*

The insurance policies at issue are known as primary comprehensive general liability policies. Issued by defendants Aetna Casualty & Surety Company ("Aetna") and General Accident Insurance Company of America ("General Accident"), these policies are similar, but not identical, and purport to provide a defense for any suit against the insured that seeks damages for bodily injury or property damage. *See* Plaintiffs' Memorandum in Support, Exhibits A–B (June 1, 1989) (excerpts from available policies). Together, these policies cover a period from December 31, 1947 to September 30, 1986. The parties do not dispute that the policies were issued and delivered to Upjohn, that all applicable premiums were timely paid, and that the insurers have rejected Upjohn's requests for defense costs. *See* Answer of General Accident, at ¶¶ 8, 10; Answer of Aetna, at ¶¶ 9, 18. Both defendant insurers contend that Upjohn did not give proper notice of the underlying proceedings.

The policies issued all contain similar language obligating the insurers to provide a defense for claims potentially within their coverage, even if the claims are fraudulent or without merit.

For example, the Aetna policies issued for the period March 1, 1965 to September 30, 1986 provide, as follows:

**I. BODILY INJURY LIABILITY COVERAGE PROPERTY DAMAGE LIABILITY COVERAGE**

The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of

bodily damage or

property damage

to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false, or

---

to the Court that it is proper for a court to grant summary judgment for the non-moving party without the formality of a cross-motion. *See, e.g., Farmers Insurance Exchange v. Allstate Insurance Co.,* 143 F.Supp. 213 (E.D.Mich.1956). *See generally* 6 Moore's Federal Practice § 56.-

12. This I will not do here, however, because of the complexity of the case, the number of parties and sites, and the Court's desire to avoid guessing at the intent and strategy of the individual parties.

fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

Plaintiffs' Exhibit A–3 to A–6.

An earlier version of this coverage read:

**II. Defense, Settlement, Supplementary Payments**

With respect to such insurance as is afforded by this Policy, the Company shall:

(a) defend any suit against the Insured alleging such injury, sickness, disease or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; but the Company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient;

(b)(1) pay all premiums on bonds to release attachments for an amount not in excess of the applicable limit of liability of this Policy, all premiums on appeal bonds required in any such defended suit, the cost of bail bonds required of the Insured in the event of automobile accident or automobile traffic law violation during the policy period, not to exceed $100 per bail bond, but without any obligation to apply for or furnish any such bonds;

(2) pay all expenses incurred by the Company, all costs taxed against the Insured in any such suit and all interest accruing after entry of judgment until the Company has paid or tendered or deposited in court such part of such judgment as does not exceed the limit of the Company's liability thereon;

(3) pay expenses incurred by the Insured for such immediate medical and surgical relief to others as shall be imperative at the time of the accident;

4) reimburse the Insured for all reasonable expenses, other than loss of earnings, incurred at the Company's request;

and the amounts so incurred, except settlements of claims and suits, are payable by the Company in addition to the applicable time limit of liability of this Policy.

*Id.* at Exhibit A–2 (Jan. 1, 1956–Jan. 1, 1957).

General Accident's policies have similar defense provisions. The policies from December 31, 1947 to January 1, 1954, for instance, provide, as follows:

**II. Defense, Settlement, Supplementary Payments.** As respects such insurance as is afforded by the other terms of this policy the company shall

(a) defend in his name and behalf any suit against the insured alleging such injury, sickness, disease or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; but the company shall have the right to make such investigation, negotiation and settlement of any claim or suit as may be deemed expedient by the company;

(b) pay all premiums on bonds to release attachments for an amount not in excess of the applicable limit of liability of this policy, all premiums on appeal bonds required in any such defended suit, but without any obligation to apply for or furnish such bonds, all costs taxed against the insured in any such suit, all expenses incurred by the company, all interest accruing after entry of judgment until the company has paid, tendered or deposited in court such part of such judgment as does not exceed the limit of the company's liability thereon, and expenses incurred by the insured, in the event of bodily injury, sickness or disease, for such immediate medical and surgical relief to others as shall be imperative at the time of accident;

c) reimburse the insured for all reasonable expenses, other than loss of earnings, incurred at the company's request.

The company agrees to pay the amounts incurred under (1), (b) and (c) of this insuring agreement in addition to the applicable limit of liability on this policy.

*Id.* at Exhibit A–1. The policies issued by General Accident were commonly known as "accident" policies. The Court also ob-

serves that General Accident only insured Upjohn—it did not insure Asgrow—and it provided coverage to Upjohn only from December 1947 to the mid–1950's.[2] Aetna's coverage began in 1956 and ran until 1986. *See id.* at A–2. Thus for the total period of alleged insurance coverage, roughly some thirty-nine years, Aetna insured plaintiffs for the majority of those years.

*Underlying Proceedings*

In nineteen separate federal and state administrative proceeding, the U.S. Environmental Protection Agency, the State of New Jersey Department of Environmental Protection, and the Common wealth of Kentucky Department of Environmental Protection have informed Upjohn by way of a "PRP letter" that the company is a "potentially responsible party" under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.*, for contamination of various sites with hazardous substances.[3] In general, the notice to Upjohn communicates that the government agency 1) alleges that Upjohn generated and arranged for the disposal or treatment of hazardous substances at a particular site; 2) contends that the substances have caused or threaten to cause contamination of the area soil and groundwater; and 3) directs Upjohn to remedy adverse conditions at the site or pay the costs that the

---

2. There is some dispute of facts here. The standard form General Accident policies issued to Upjohn cover property damage caused by "accident". Policies CG–188817 covered the period from 1947 to 1954. One endorsement to this policy was effective from December 1952. A second endorsement on another policy (ICG–240600) was effective from March 1954. Plaintiffs' Exhibits B–1, D–1, 2. These endorsements appear to apply only to five sites in Kalamazoo, including the Portage Road site, the only one applicable here. Importantly, the endorsements included a pollution-inclusion clause.

3. One PRP letter from the U.S. Environmental Protection Agency informed Upjohn, as follows:
 Re: Notice letter pertaining to the Pending Remedial Investigation and Feasibility Study at the Bay Drums Superfund Site, Tampa, Florida
 Dear Sir/Madam:
 The United States Environmental Protection Agency (EPA) is considering spending public funds to investigate and take corrective action for the control of releases of hazardous substances at the above-referenced Bay Drums Superfund Site ("Site") located on State Highway 574 in East Tampa, near the intersection of Highways 60, Interstate 4 and Faulkenburg Road. This action will be taken pursuant to Section 104 and other provisions of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 CERCLA, as amended by the Superfund Amendments and Reauthorization Act (RCRA), 42 U.S.C. Section 9601 *et seq.*, unless EPA determines that such action will be done properly by a responsible party. Under Section 107(a) of CERCLA and other laws, responsible parties may be liable for any costs incurred by the government in taking corrective actions at the Site. Such costs may include, but are not necessarily limited to, expenditures for investigation, planning, clean-

up of the site and enforcement. Responsible parties under CERCLA include the current and past owners and operators, and persons who generated the hazardous substances or were involved in the transportation, treatment, or disposal of these substances at the Site.

\* \* \* \* \* \*

EPA has determined that a release of hazardous substances (as defined by Section 101(14) of CERCLA) has occurred at the Site. At the present time chlordane, 1, 1–dichoroethane, 1, 1–dichlorethylene, toluene, lead and chromium have been released at the Site. As a result of the release, contamination of the surficial aquifer groundwater has occurred and groundwater wells may be threatened by contamination.

\* \* \* \* \* \*

EPA will consider an immediate, unequivocal offer from you to conduct and/or fund the [remedial investigation/feasibility study] ("RI/FS"), provided that you agree to the conditions under which you may do so. As explained previously in this letter, if you decline to perform the RI/FS, you may be liable for all costs associated with the RI/FS which are incurred by EPA.

\* \* \* \* \* \*

You should notify EPA in writing within thirty (30) calendar days from the receipt of this letter of your willingness to conduct or participate in the RI/FS. Otherwise, EPA will assume that you decline any involvement in the RI/FS and will proceed with the appropriate activities and studies. EPA will later invite you to undertake the design and implementation of the selected remedy upon EPA's completion of the RI/FS.

\* \* \* \* \* \*

Plaintiffs' Exhibit H.

government itself would incur in correcting the contamination problem. *See* Plaintiffs' Exhibit H & attachments. The nineteen sites for which Upjohn has been notified that it is a potentially responsible party are as follows:

| Site | Means and Date of Notification |
| --- | --- |
| Bay Drums | USEPA 106/104 Letter stamped Feb. 24, 1988 |
| Beacon Heights | USEPA 107/104 Letter dated March 26, 1985 |
| Berlin & Farro | USEPA 107/104 Letter stamped Nov. 8, 1983 |
| Butler Tunnel | USEPA 106/107 Letter stamped May 30, 1986 |
| Chemical Control | NJ DEP PRP Letter dated October 30, 1987<br>USEPA 107/104 Letter stamped Feb. 24, 1988 |
| Cork Street | USEPA 104 Letter stamped Jan. 8, 1987<br>USEPA 107 Letter stamped July 17, 1987 |
| Distler Farm and Brickyard | USEPA 106/104 Letter stamped Nov. 12, 1985 |
| Fisher–Calo | USEPA 107/104 Letter dated Feb. 3, 1988 |
| KL Avenue | USEPA 107/104 Letter received Apr. 29, 1985 |
| Kin–Buc | USEPA 107/104 Letter stamped Jan. 11, 1984 |
| Liquid Disposal<br>Lone Pine | USEPA 107/104 Letter stamped July 27, 1984<br>USEPA 107 Letter stamped Sept. 24, 1985 |
| Maxey Flats | USEPA 107 Letter stamped Nov. 26, 1986 |
| Melton Avenue | USEPA 107/104 Letter stamped July 25, 1986<br>KYDEP PRP Letter marked Nov. 18, 1985 |
| Old Mill | USEPA 107/104 Letter stamped Sep. 30, 1983 |
| Pulverizing Services | USEPA Request for Removal dated Dec. 17, 1987<br>USEPA 107 Letter stamped March 25, 1988<br>USEPA 107/104 Letter stamped March 31, 1988 |
| Scientific Chemical | USEPA 104 Letter stamped Feb. 25, 1985<br>USEPA PRP Letter received March 20, 1985<br>USEPA 107 Letter stamped Feb. 5, 1988 |
| Seymour | USDOJ 104 Letter undated<br>USDOJ 107 Letter dated May 14, 1982 |
| Thermo Chem | USEPA 107/104 Letter stamped April 3, 1987 |

---

Upjohn represents to the Court that it has incurred defense costs to challenge the governments' allegations of liability or proposed studies and remedies. *See* Plaintiffs' Exhibit G (Affidavit of Whitlock, Environmental Counsel). To date, Upjohn has incurred the following unreimbursed defense expenditures [4]:

4. *See* Plaintiffs' Exhibit G (Affidavit of Whit- lock); Defendant General Accident's Motion for

| Site | Unreimbursed Expenditures | Remedial Costs |
|---|---|---|
| Auburn Road | $ 75.00 | |
| Bay Drums Site | 1,790.80 | |
| Barrels, Inc. | 13,301.47 | |
| Beacon Heights Landfill | 518,331.44 | $ 638,524.70 |
| Berlin and Farro Liquid Incineration Site | 112,484.28 | |
| Butler Tunnel Site | 51.40 | |
| Chemical Control Site | 29,066.73 | |
| Cork Street Landfill | 439.50 | |
| Distler Farm and Distler Brickyard Sites | 359.60 | |
| Fisher–Calo Chemical and Solvents Corporation | 3,943.44 | |
| KL Avenue Landfill | 458,066.57 | |
| Kin–Buc Landfill | 2,875.10 | |
| Laural Park | 320.10 | |
| Liquid Disposal, Inc. | 30,998.30 | |
| Lone Pine Landfill | 644.30 | |
| Maxey Flats Nuclear Disposal Site | 3,152.40 | |
| Melton Avenue Site | 115.40 | |
| Old Mill Hazardous Waste | 847.41 | |
| Portage Road | -0- | 3,615,000.00 |
| Pulverizing Services, Inc | 15,630.80 | |
| Scientific Chemical Processing Facilities | 144,668.26 | |
| Seymour Recycling Site | 69,424.00 | |
| Spring Street | 900.00 | 2,484,000.00 |
| Thermo Chem Site | 2,590.31 | |
| Verona Wellfield | -0- | |

Several of these administrative proceedings have led to lawsuits against Upjohn, and other PRPs, seeking a consent decree for remedial environmental action. *See* Plaintiffs' Exhibits I–J. Upjohn has also been named as a defendant in a number of private actions involving similar allegations and claims for relief.

In one pending CERCLA action, a third-party plaintiff alleges that Upjohn—among others—generated and arranged for the disposal or treatment of hazardous substances at four sites in Battle Creek, Michigan. There is currently contamination of the soil and groundwater and the third-party plaintiff seeks indemnification or contribution for Upjohn's alleged share of response costs required in proceedings initiated by the U.S. Environmental Protection Agency and the State of Michigan Department of Natural Resources. *See Grand Trunk Western Railroad Co. v. Acme Belt Recoating, Inc.*, No. 87–364, 1990 WL 164724 (W.D.Mich.).

In a second private action, *Lansing Iron and Metal Co. v. Upjohn*, No. 83–50667 (Mich.Cir.Ct. Ingham Co.), third-party plaintiffs raised similar tort indemnification and contribution claims against third-party defendants, including Upjohn.[5] Upjohn claims that it has or expects to incur unreimbursed defense costs related to these private actions. *See* Affidavit of Whitlock, Plaintiffs' Exhibit G; Plaintiffs' Exhibit K, L.[6]

Recently, in plaintiffs' answer to interrogatories, plaintiffs acknowledged that

Summary Judgment, Exhibit H (Upjohn's Answers to Interrog.). Upjohn has not yet incurred defense costs with regard to every site in the complaint; however, it seeks a general declaration by this Court which will in all likelihood be applicable to any future expenditures incurred at other sites.

5. This case was dismissed without prejudice, but Upjohn expects to be joined in a related suit against C & O Railway brought by the State of Michigan.

6. Defendant Aetna represents to the Court that of the four complaints filed with regard to the twenty six (26) sites, Aetna is providing a defense, under a reservation of rights, in *C & O*

they are not at this time alleging that defendant General Accident is obligated to defend with respect to fifteen (15) sites, including 1) Bay Drum Site; 2) Barrels, Inc.; 3) Berlin and Farrow Liquid Incineration Site; 4) Chemical Control Site; 5) Distler Farm and Distler Brickyard Sites; 6) Kin–Buck Landfill; 7) Liquid Disposal, Inc.; 8) Lone Pine Landfill; 9) Maxey Flats Nuclear Disposal Site; 10) Melton Avenue Site; 11) Old Mill Hazardous Waste Site; 12) Rooney Property; 13) Scientific Chemical Processing Facilities; 14) Seymour Recycling Site; and 15) Thermo Chem Site. In addition, at that time, plaintiffs contended that General Accident "may be obligated to defend" with regard to three (3) sites which "may have been used during the period in which General Accident provided comprehensive general liability insurance." See Defendant General Accident's Brief in Opposition, Exhibit 1 (July 10, 1989) (Answer 2). Subsequently, however, for purposes of the summary judgment motion, Upjohn acknowledged that it "seeks now to establish General Accident's defense obligation only with regard to the Cork Street and Portage Road sites." Upjohn's Reply Brief, at 2 n. 1 (Aug. 15, 1989).

## DISCUSSION

### DUTY TO DEFEND

Not long ago, this Court decided a duty to defend issue in a major environmental case, *United States Fidelity and Guaranty Co. v. Thomas Solvent*, 683 F.Supp. 1139 (W.D.Mich.1988). In *Thomas Solvent*, I held that the insurers had a broad duty to defend where they issued comprehensive general liability policies similar to those in this case and where the underlying proceedings were CERCLA actions brought by federal and state governments to recover remedial costs and by private parties for personal injury and property damage claims. This case will be of some help in deciding the matter before me; however, because of differences in material facts, *Thomas Solvent* is not wholly controlling.[7]

It is well-accepted that an insurer's duty to defend is considerably broader than the duty to indemnify. *See, e.g., Stockdale v. Jamison*, 416 Mich. 217, 330 N.W.2d 389 (1982). The duty to defend under Michigan law is distinct and indeed independent of an insurer's duty to pay. *Id.; Thomas Solvent*, 683 F.Supp. at 1151. In general, a comprehensive general liability insurer must provide a defense for their insured where the insured is charged with causing damage or injury arising out of the dumping, transporting, generating, or handling of hazardous waste. *Thomas Solvent*, 683 F.Supp. at 1151. As I recognized in 1988, there is some state authority for the proposition that insurers should not be required to defend unless and until the nature of the underlying claims and the precise timing of the environmental damage can be addressed. This authority represents a minority view, and is not the trend under Michigan law. *Id.*

It is also well established under Michigan law that the duty to defend must be determined solely by comparing the policy language with the allegations of the underlying proceedings; where the allegations potentially state a claim that arguably is covered by the policy, the insurer must defend. *Id.; FL Aerospace Corp. v. Aetna Casualty & Surety Co.*, No. 87–CV–60070–AA, slip. op. (E.D.Mich.1988); *Detroit Edison Co. v. Michigan Mutual Insurance Co.*, 102 Mich.App. 136, 301 N.W.2d 832 (1980); *Dochod v. Central Mutual Insurance Co.*, 81 Mich.App. 63, 264

*Railway v. Lansing Iron & Metal* and *Grand Trunk Western Railroad v. Acme Belt Recoating.* *See* Defendant Aetna's Exhibit B. According to defendant, Upjohn never tendered to Aetna the complaint in *United States v. Berlin & Ferro.* And, although Aetna was tendered the complaint in *United States v. B.F. Goodrich* after the consent decree was entered, Upjohn did not request Aetna to provide a defense in that mat-

ter. *See* Defendant Aetna's Brief in Opposition, at 2 & n. 2 (July 10, 1989).

7. Furthermore, as the parties have carefully noted from time to time in their written briefs, there is some case law—decided subsequent to *Thomas Solvent*—which has expanded the body of relevant principles on the duty to defend issue.

N.W.2d 122 (1978). The Michigan Court of Appeals in *Detroit Edison v. Michigan Mutual,* wrote that the duty to defend "extends to actions which are groundless, false, or fraudulent, so long as the allegations against the insured *even arguably* come within policy coverage." 102 Mich. App. at 140, 301 N.W.2d 832 (emphasis in original).

■ Accordingly, in evaluating whether there is a duty to defend, the policyholder is not required to prove—and the insurance carrier is not permitted to challenge—the ultimate right to indemnification. *See City Poultry & Egg Co., Inc. v. Hawkeye Casualty Co.,* 297 Mich. 509, 298 N.W. 114, 115 (1941); *Zurich Ins. Co. v. Rombough,* 384 Mich. 228, 180 N.W.2d 775, 777; *accord Thomas Solvent,* 683 F.Supp. at 1162 (there is "no reason why the insured, whose insurer is obligated by contract to defend him, should have to try the facts in a suit against his insurer in order to obtain a defense") (citing *Independent Petrochem. Corp. v. Aetna Cas. & Sur.,* 654 F.Supp. 1334, 1346 (D.D.C.1986)). Put another way, "insurance companies must be strictly held to this obligation to defend without proof that no possible basis in fact or law exists to exclude liability under the policy." *American Motorists Ins. Co. v. Levelor Lorentzen, Inc.,* 1988 WL 112142, 1988 U.S. Dist. LEXIS 11631 (D.N.J.1988)

Of course, on the other hand, if an insurer has specifically and explicitly excluded coverage with unambiguous policy language, the express exclusions will free the insurer from any duty to defend. *Thomas Solvent,* 683 F.Supp. at 1151; *North River Insurance Co. v. Endicott,* 151 Mich.App. 707, 391 N.W.2d 454 (1986).

■ In making this threshold determination, the true merits of the underlying claims—that is, facts outside the four corners of the underlying claims that might negate coverage—are not taken into account. *Thomas Solvent,* 683 F.Supp. at 1151 (where an insurer's arguments against a duty to defend are based on facts outside the complaint, courts generally rule that the claims must nevertheless be defended.) The underlying facts therefore

are insufficient to release an insured from its duty to defend even if they reveal a basis for excluding coverage. *See Dochard,* 81 Mich.App. 63, 264 N.W.2d 122; *Zurich Insurance Co. v. Rombaugh,* 384 Mich. 228, 180 N.W.2d 775 (1970). A corollary of this rule is that the duty to defend is triggered for an entire action if "only some of the allegations arguably fall within coverage provisions even if others do not." *Thomas Solvent,* 683 F.Supp. at 1151 (citing *Niagara County v. Utica Mutual Insurance Co.,* 80 A.D.2d 415, 439 N.Y.S.2d 538 (4th Dept.1981)).

Finally, summarizing principles a court must use in deciding whether the allegations in a given claim trigger a duty to defend, the Michigan Court of Appeals observed that where there is doubt as to whether or not a claim alleges liability under the policy, "the doubt must be resolved in the insured's favor." *Detroit Edison,* 102 Mich.App. at 142, 301 N.W.2d 832 (citing 14 *Couch on Insurance* 2d § 51:45, at 538)).

Before I address the specifics of each defendant, there are two important preliminary issues relevant to both Aetna and General Accident. The first issue requires me to decide whether a correspondence from a federal or state administrative agency, commonly known as a PRP letter, identifying an insured as a potentially responsible party for environmental damage is a "suit" that would trigger an insurer's duty to defend under the terms of its comprehensive liability policies. The second issue raised here is whether the relief sought in the underlying proceedings, including clean-up costs, constitutes "damages" within the meaning of the insurance policies.

## PRP LETTER AS A "SUIT"

■ In this case, the insurance contract limits the duty to defend to those instances where the insured is the subject of a "suit." While the contracts do not define the term "suit," that term has a well-accepted ordinary meaning. In plain language, the term refers to court proceedings. Many courts considering this issue have agreed. *See Aetna Casualty & Sure-*

*ty Co. v. Gulf Resources and Chemical Corp.,* 709 F.Supp. 958, 960 (D. Idaho 1989) ("suit" limited to civil litigation, not administrative claims or proceedings); *Detrex Chemical Industries v. Employers Insurance of Wausau,* 681 F.Supp. 438, 443 (N.D.Ohio 1987); *Harter Corp. v. Home Indemnity Co.,* 713 F.Supp. 231, 233 (W.D.Mich.1989) (word "suit" plainly means some type of court proceeding); *City of Evart v. Home Ins. Co.,* No. 103621, slip op., at 2–3 (Mich.App. April 10, 1990) (word "suit" did not encompass notice letter from state administrative agency); *Arco v. Home Indemnity,* No. 87–0218–CK, slip op., (Kal.Cir.Ct. Dec. 12, 1988) (Defendant's Ex. N); *Technicon Electronics Corp. v. American Home Assurance Co.,* 141 A.D.2d 124, 533 N.Y.S.2d 91 (2d Dept.1988). Each of these cases held that an insurer's duty to defend is not triggered by the mailing of a PRP letter by the EPA or by a state environmental agency.[8]

There is contrary authority, however. In *American Motorists Insurance Co. v. Levelor Lorentzen Inc.,* No. 88–1994, slip op., at n. 2, 1988 WL 112142 (D.N.J. Oct. 14, 1988), the court found that "Due to the scope of CERCLA, the EPA's letter of notification that Levelor was a potentially responsible party was sufficient to trigger the duty to defend, since the letter forced Levelor to take legal action to defend its interests." Similarly, in *Fireman's Fund Insurance Co. v. Ex–Cell–O Corp.,* 662 F.Supp. 71 (E.D.Mich.1987), the Court rejected the argument that the duty to defend arises only after the insured is the subject of civil litigation. "[C]overage does not hinge on the form of action taken or the nature of relief sought, but on an actual or threatened use of legal process to coerce payment or conduct by a policyholder.... Accordingly, I hold that a 'suit' includes any effort to impose on the policyholders a liability ultimately enforceable by a court...." *Id.* at 75.[9] *See also Avondale Industries, Inc. v. Travelers Indemnity Co.,* 887 F.2d 1200 (2d Cir.1989); *Boeing Company v. Aetna,* No. C86–352, oral opinion, (W.D.Wash. April 16, 1990); *Polkow v. Citizens Insur. Co.,* 180 Mich.App. 651, 447 N.W.2d 853 (1989); *C.D. Spangler Construction Co. v. Industrial Crankshaft & Engin. Co.,* 326 N.C. 133, 388 S.E.2d 557 (1990).

Plaintiffs argue, rather inconspicuously in a footnote that *United States Aviex Co. v. Travelers Insurance Co.,* 125 Mich.App. 579, 336 N.W.2d 838 (1983) supports their position. In that case, the Michigan Department of Natural Resources ("DNR"), notified the insured that it would have to investigate and remedy toxic contamination

---

**8.** Similarly, *Solo Cup Co. v. Federal Insurance Co.,* 619 F.Supp. 1178, 1188–89 (7th Cir.1980), held that the duty to defend did not arise where a federal agency determined, after investigation, that a government contractor had discriminated against its employees and proposed that the insured take remedial action to avoid litigation. Refusing to find a duty to defend in the case before me would also be consistent with a formidable body of authority which recognizes no duty to defend absent the initiation of a lawsuit. *See Fisher v. Hartford Accident & Indemn. Co.,* 329 F.2d 352, 353 (7th Cir.1964) (an insurer's defense obligation does not require it to reimburse legal fees incurred by the insured after an accident took place but before suit was filed); *John Mohr & Sons v. Hanover Ins. Co.,* 322 F.Supp. 184, 188 (N.D.Ill.1971) ("the first obligation to defend is determinable and arises, if at all, *when the suit is filed*") (emphasis supplied); *Manny v. Estate of Anderson,* 117 Ariz. 548, 574 P.2d 36 (Ct.App.1977) ("[i]f there was a breach of contract due to refusal to defend, it must have been anticipatory repudiation because the

obligation to defend does not arise until the insurer is presented with a complaint"); *Marcel Heat Corp. v. Traveler's Indem. Co.,* 325 Mass. 682, 92 N.E.2d 233 (1950) (where at the time of insurer's disclaimer no customer had filed an action against the insured, disclaimer did not breach obligation to defend).

**9.** Defendant Aetna urges the Court to disregard *Ex–Cello* due to its reliance upon *Aviex.* In the words of Aetna:

> The decision of the trial court in *Fireman's Fund Ins. Co. v. Ex–Cell–O,* 662 F.Supp. 71 (E.D.Mich.1987) is simply incorrect. The trial judge got off on the wrong foot by relying upon the *Aviex* decision, which did not apply. In holding that coverage is triggered by 'an actual or threatened use of legal process to coerce payment or conduct,' the *Ex–Cell–O* Court abandoned any reasonable interpretation of the policy's restriction of the duty to defend 'suits.'

Defendant Aetna's Brief in Support, at 7 (July 10, 1989).

caused by a fire on its premises. The letter indicated that the DNR would pursue legal action if the insured failed to comply. For two years, the insured engaged in remedial efforts, with the DNR periodically reminding it that failure to correct the contamination would result in "escalated enforcement action ... including a lawsuit for damages...." *Id.* at 584, 336 N.W.2d 838. Before the state filed suit, the insured sought a declaratory judgment that its insurer was obligated to defend and indemnify it. *Id.* The trial court found in favor of the insured.

On appeal, the insurer argued that the judgment was in error because no actual controversy existed between the parties. The court clearly disagreed:

> In this case, the [insured] was faced with threats of legal action by the DNR. Although, as defendant argues, the DNR could seek legal redress in the form of an order for abatement of water pollution, a criminal complaint, or injunctive relief, and so possibly never seek a remedy covered by the insurance policy, [the insured] nevertheless needed to know whether the defendant would be required to defend against a covered remedy *should such a remedy be sought.* Only with this knowledge could [the insured] choose between voluntarily complying with the DNR's very real and repeated demands and opposing the DNR's actions.

*Id.* at 586, 336 N.W.2d 838 (emphasis added).

So the *Aviex* court did not hold that the DNR's notification letter triggered the insurer's duty to defend. Rather, it held that a justiciable controversy existed, before the DNR filed suit, over whether the insurer would be obligated to defend and indemnify the insured if the DNR later filed suit. *Id.* at 586, 336 N.W.2d 838. As it happened, the DNR did file suit, and it sought injunctive relief rather than reimbursement for the cost of cleanup. The remainder of the court's opinion is, thus, devoted to the issue of whether the cost of responding to an injunctive order would be covered by the insurer's obligation to defend and indemnify suits seeking damages. The court answered that question in the affirmative, finding no meaningful distinction between the two remedies.

I conclude then that the PRP letter issued to an insured is not a "suit" within the meaning of the general liability insurance policies and that such a correspondence does not trigger a duty to defend on the part of the insurers. First, a significant body of authority, including decisions from this Court, favors the insurers' position. *See Arco Industries Corp. v. The Travelers Insur. Co.*, 730 F.Supp. 59 (W.D.Mich.1989); *Harter Corp. v. Home Indemnity Co.*, 713 F.Supp. 231 (W.D.Mich.1989). Second, one Michigan court to consider the precise issue presented here has agreed with the insurers' position, albeit in an unpublished opinion. *See City of Evart v. Home Ins. Co.*, No. 103621, slip. op., (Mich.Ct.App. April 10, 1989). The courts in Michigan have not been without conflict on this issue. *See Polkow*, 180 Mich.App. 651, 447 N.W.2d 853. My decision here is in accord with *City of Evart* and is affected perhaps most significantly by the "plain meaning" standard applied to the term "suit". *See infra* n. 10 and accompanying text. Third, the insurers' position most closely corresponds with the plain meaning of the word "suit." [10] That term is generally used to

---

**10.** The following definitions appear in commonly used lay dictionaries: "An action or a process in a court for the recovery of a right or claim." Webster's Seventh New Collegiate Dictionary (1965) and Webster's Third New International Dictionary (1981); "Action to secure justice in a court of law; attempt to recover a right or claim through legal action." Webster's New World Dictionary of the English Language (College Ed. 1968); "A proceeding in a court of law or chancery, in which a Plaintiff demands the recovery of a right or the redress of a wrong." Funk and Wagnall's Standard Desk Dictionary (1980); "Any proceeding in court to recover a right or claim." The American Heritage Dictionary of The English Language (New College Ed.1978); "Case in a court of law; application to a court of justice." Scott Foresman, Advanced Dictionary (Double Day Ed.1979).

These lay definitions of the term "suit" cohabit comfortably with those in prominent legal dictionaries. In Black's Law Dictionary 1286 (5th ed. 1979), the word "suit" is defined as "[A]

refer to formal legal proceedings, such as the initiation of civil litigation, and not to informal actions by administrative agencies. In short, I simply cannot find that the term is ambiguous in this context.

At this point, the EPA and state governments have only required plaintiffs to furnish it with certain information. They have not required plaintiffs to engage in any clean up efforts itself, or to pay any damages or fines for clean up costs incurred by the EPA. At twenty-two sites, there has been no complaint filed against plaintiffs, nor has the EPA entered any administrative orders against plaintiffs pursuant to its authority under 42 U.S.C. § 9606(a). In short, nothing has occurred to date that resembles either a lawsuit or a formal administrative adjudication in any meaningful fashion. The insurers are not obligated to defend plaintiffs until a "suit" has been filed against it. Since that event has not yet transpired, I find that the insurers are entitled to judgment as a matter of law on this issue.

Thus, at the seventeen (17) sites where plaintiffs have received PRP letters from the EPA or state authorities (but no complaint has been filed), defendant insurers Aetna and General Accident have no duty to defend under their general liability policies.[11] Plaintiffs allege a duty to defend against Aetna on seventeen (17) sites and against defendant General Accident on one (1) site, the Cork Street site, where a PRP letter only has been filed. *See* Appendix A.[12]

CLEAN–UP COSTS AS "DAMAGES"

■ The second issue, more easily disposed of, is whether the relief sought in the underlying proceedings, including clean-up costs, constitutes "damages" as defined by the insurance policies. The term "damages" is not defined in the standard comprehensive general liability policies before me.[13] Yet this Court, as others, has held that clean up costs should be recoverable as sums that the insured was liable to pay as a result of property damage. *See U.S. Fidelity and Guaranty Co. v. Thomas Solvent*, 683 F.Supp. 1139 (W.D.Mich. 1988).[14] As I stated in that case:

It is clear to me that once property damage is found as a result of environmental contamination, clean-up costs should be recoverable as sums that the insured was liable to pay as a result of property damage. In this context the argument concerning the historical separation of damages and equity is not convincing[,] and it seems to me that the insured ought to be able to rely on the common sense

generic term, of comprehensive signification, referring to any proceedings by one person or persons against another or others in a court of justice in which the Plaintiff pursues, in such court, the remedy which the law affords him for the redress of an injury or the enforcement of a right."

11. Those seventeen sites are as follows: Bay Drums, Butler–Tunnel, Chemical Control, Cork Street, Distler Farm and Brickyard, Fisher–Kalo, KL Avenue, Kin–Buc, Liquid Disposal, Lone Pine, Maxey Flats Nuclear Disposal, Melton Avenue, Old Mill, Pulverizing Services, Scientific Chemical Processing, Seymour Recycling, and Thermo–Chem.

12. The Court originally intended to defer ruling on the three (3) sites for which plaintiffs alleged both insurers *may* have insured on the risk (Auburn Road, Fisher-Calo, and Butler Tunnel).

13. I note, however, that beginning in March 1985, the Aetna policies contained an amendment defining "damages" to include both "compensatory" and "punitive" damages.

14. *See also Fireman's Fund Insurance Co. v. Ex-Cell-O*, 685 F.Supp. 621, 625 (E.D.Mich.1987); *Avondale Industries, Inc. v. Travelers Indemnity Co.*, 697 F.Supp. 1314, 1315, 1318–20 (S.D.N.Y.1988) (cleanup costs come within CGL coverage as "damages"); *Intel Corp. v. Hartford Accident & Indemnity Co*, 692 F.Supp. 1171 (N.D.Cal.1988) (cleanup costs pursuant to CERCLA are covered "damages"); *Township of Gloucester*, 668 F.Supp. 394 (landfill cleanup costs incurred under CERCLA are "damages"); *New Castle County v. Hartford Accident and Indemnity Co.*, 673 F.Supp. 1359 (D.Del.1987) (rejecting a technical reading of "damages" and adopting the view that CERCLA response costs or costs relating to other remedial actions are "damages"); *United States Fidelity Guaranty Co. v. Colorado National Bank*, No. 86–Z–1033, slip op. at 5 (D.Colo., Nov. 4, 1988) (comparing CERCLA response costs to automobile repair costs, which constitute covered "damages") (copy attached as Exhibit Y); *Chesapeake Util. Corp. v. American Home Ins. Co.*, 704 F.Supp. 551, 561, 565 (D.Del.1989); *Commercial Union*

expectation that property damage within the meaning of the policy includes a claim which results in causing him to pay sums of money because his acts or omissions affected adversely third parties. While such claims might be characterized as seeking 'equitable relief" the cleanup costs are essentially compensatory damages for injury to common property and for that reason the insurer has a duty to defend.

*Id.* at 1168. Here, as in *U.S. Fidelity and Guaranty Co.*, "the short answer is that from the standpoint of the insured damages are being sought for injury to property. It is that contractual understanding rather than some artificial and highly technical meaning of damages which ought to control." *Id.*

## REMAINING SITES WHERE COMPLAINTS FILED

Where actual complaints have been filed against them, plaintiffs allege a duty to defend against Aetna at four sites, Barrels, Inc., Berlin & Farro Liquid Incineration, Beacon Heights, and Verona Wellfield. As already noted, defendant Aetna is providing a defense in all four actions where complaints have been filed, under reservation of rights.

## AETNA'S FOUR SITES (BARRELS, INC., BERLIN & FARRO, BEACON HEIGHTS, VERONA WELLFIELD)

### *Duty to Defend*

In determining the duty to defend issue, the starting point is an examination of the provisions of the relevant policies. *E.g., Pepper's Steel & Alloys v. U.S. Fidelity & Guaranty Co.*, 668 F.Supp. 1541, 1545–46 (S.D.Fla.1987). The Court has reviewed the standard comprehensive general liability policies issued by defendant Aetna over the relevant time periods. The term "occurrence", defined in these policies, is "an accident, including continuous or re-

peated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured", or very similar language. *See* Plaintiffs' Exhibits C4–C7.[15]

I must now compare the policy language with the allegations in the four underlying complaints. *See* Plaintiffs' Exhibits I, J, K, L. Based on the principles set forth in *U.S. Fidelity and Guaranty Co.* and a growing body of case law, I find that the alleged exposures of the environment to pollutants, constitute an "occurrence" under these comprehensive general liability policies. 683 F.Supp. 1139. *See also Gloucester v. Maryland Casualty Co.*, 668 F.Supp. 394, 401 (D.N.J.1987) ("Pollution by means of gradual permeation is no less an occurrence than that emitted by way of a sudden release"); *Pepper's Steel & Alloys v. United States Fidelity & Guaranty Co.*, 668 F.Supp. 1541, 1548 (S.D.Fla.1987) (allegations of CERCLA liability do not establish that environmental damage resulting from daily business operations was expected or intended by the policyholder); *Payne v. United States Fidelity & Guaranty Co.*, 625 F.Supp. 1189, 1192–93 (S.D.Fla.1985) ("Complaints filed against the plaintiffs herein by the EPA ... are devoid of allegations compelling the conclusion that the plaintiffs herein intended or expected the discharge of PCBs into the environment"); *Steyer v. Westvaco Corp.*, 450 F.Supp. 384, 388 (D.Md.1978) (insurer must show actual intent to cause harmful result in order to prove that injury or damage was intended). A complaint alleging potential liability for a polluting event, brought pursuant to CERCLA, absent allegations that the event was expected or intended, creates a duty to defend on the part on the insurer. *Id.* The burden on the insured to demonstrate the

---

*Ins. Co. v. Taxel,* No. 87–336–S, slip op. at 6 (S.D.Cal., Aug. 18, 1988).

**15.** The standard form Aetna policies issued to Upjohn from 1956 to 1969 cover property damage caused by "accident", but were amended to cover property damage caused by "occurrence". *See* Plaintiff's Exhibit C1–C4. Michigan courts have almost uniformly interpreted the term "ac-

cident" coextensively with and just as broadly as the term "occurrence." *See, e.g., Guerdon Indus., Inc. v. Fidelity Casualty Co.,* 371 Mich. 12, 123 N.W.2d 143 (1963); *Brant v. Citizens Mut. Auto. Ins. Co.* 4 Mich.App. 596, 145 N.W.2d 410 (1966). I see no reason not to treat "accident" and "occurrence" similarly in this context. *See United States Fidelity and Guaranty Co.,* 683 F.Supp. at 1171.

absence of "expected or intended" damage resulting from an occurrence, in a duty to defend analysis, of course, is addressed by focusing on the allegations within—and not outside of—the relevant complaints. Although defendant Aetna argues that "Upjohn did not attempt to show that the property damage was neither expected nor intended", Upjohn has addressed this issue and cited authority which shows that an insured relies upon *the absence of* allegations in the complaint which suggest the polluting event was intentional. *See* Plaintiffs' Brief, at 15 & n. 20 (June 1, 1989).

Many of the policies issued by Aetna, however, contain a pollution exclusion.[16] Such an exclusion functions to exclude coverage for pollution incidents generally, but makes an exception where the discharge is "sudden and accidental." The pollution exclusion provides in relevant part, as follows:

> The insurance does not apply to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon the land, the atmosphere or any watercourse or body of water; but this exclusion does not apply:
>
> (1) if such discharge, dispersal, release or escape is sudden and accidental, . . . .

Defendant Aetna's Exhibit E.

■ The ultimate burden of demonstrating applicability of the general pollution exclusion is on the insurer, yet at least some courts have held that the burden of proof is on the insured to show that the "sudden and accidental" exception applies. *See Fireman's Fund v. Ex-Cello*, 702 F.Supp. 1317 (E.D.Mich.1988); *Fischer &*

*Porter Co. v. Liberty Mutual Insurance Co.*, 656 F.Supp. 132 (E.D.Pa.1986); *Couch on Insurance* § 79.385, at 338 (2d ed.).

■ In this case, there is no dispute that the lawsuits allege pollution discharges. The question of the "sudden and accidental" exception is more involved. The Sixth Circuit has recently done what the Michigan Supreme Court has not, that is, it has defined the meaning of the oft-litigated phrase "sudden and accidental." [17]

In *F L Aerospace v. Aetna*, the Sixth Circuit held that the terms "sudden" and "accidental" are not ambiguous and should be accorded a plain, everyday meaning. 897 F.2d 214 at 219 (6th Cir.1990). A "sudden and accidental event," according to the court, "is one that happens quickly, without warning, and fortuitously or unintentionally." *Id.*

Under the duty to defend standard, reading only the policy language in conjunction with the complaints and resolving all doubts in favor of the insured, I find that defendant Aetna has a duty to defend plaintiffs where a formal complaint has been filed. The allegations of the complaint warrant a conclusion that the disposal, escape, or release of hazardous substances "arguably fall within coverage provisions." Since the complaints charge CERCLA violations, the disposal, escape, or releases may or may not have been "sudden and accidental." I will not try the underlying claim by taking into consideration or requiring facts beyond the four corners of the underlying claims.

Defendant Aetna also argues against finding a duty on its part to defend plaintiffs because Upjohn has breached its own duties under certain policies.[18] More spe-

---

**16.** All Aetna policies effective from 3–1–72 contain a pollution exclusion. From that date to 3–1–85 the clause was a negotiated version of the standard exclusion. *See* Defendant Aetna's Exhibit E. After March 1985, the policies contain what is termed the absolute exclusion.

**17.** A panel of the Sixth Circuit certified this issue to the Michigan Supreme Court in *International Surplus Lines v. Anderson Development*, No. 87–2102, in January 1989. The Michigan

Court declined to answer the question. *See F L Aerospace v. Aetna*, 897 F.2d 214 (6th Cir.1990).

**18.** The duties claimed by Aetna here are: (1) to notify the insurer of an occurrence "as soon as practicable"; (2) to deliver "immediately" all legal papers; and (3) to avoid voluntarily incurring any financial obligation except at the insured's own expense. *See* Defendant Aetna's Exhibit C; *Wood v. Duckworth*, 156 Mich.App. 160, 163, 401 N.W.2d 258 (1986) (No–Action clause precludes suit against insurer where in-

cifically, Aetna argues that Upjohn gave insufficient or late notice of certain policy events.

I will briefly discuss the relevant law on the late notice defense here. A more extensive discussion is used at a later point in this opinion, on the duty to indemnify issue. Under Michigan law, late notice to the insurer is not a defense to coverage unless the insurer can demonstrate that it has been prejudiced by the delay. *Wendel v. Swanberg*, 384 Mich. 468, 478, 185 N.W.2d 348 (1971); *Wehner v. Foster*, 331 Mich. 113, 117, 49 N.W.2d 87 (1951); *Kennedy v. Dashner*, 319 Mich. 491, 494, 30 N.W.2d 46 (1947); *Wood v. Duckworth*, 156 Mich.App. 160, 163, 401 N.W.2d 258 (1986); *Anderson v. Kemper Insurance Co.*, 128 Mich.App. 249, 253–54, 340 N.W.2d 87 (1983); *Burgess v. American Fidelity Fire Insurance Co.*, 107 Mich.App. 625, 628, 310 N.W.2d 23 (1981); *Kermans v. Pendleton*, 62 Mich.App. 576, 581–82, 233 N.W.2d 658 (1975). Notice provisions requiring notice to the insurer "as soon as practicable" have been interpreted to require notice within a "reasonable time dependent upon the facts and circumstances of the case." *Motor State Insurance Co. v. Benton*, 35 Mich. App. 287, 290, 192 N.W.2d 385 (1971). *See also Wendel*, 384 Mich. at 47, 185 N.W.2d 348; *Kennedy*, 318 Mich. at 494, 30 N.W.2d 46; *Burgess*, 107 Mich.App. at 628, 310 N.W.2d 23. The purpose of notice provisions is "to allow the insurer to make a timely investigation of the accident in order to evaluate claims and to defend against fraudulent or excessive claims." *Wendel*, 384 Mich. at 477, 185 N.W.2d 348.

There is no simple rule under Michigan law for determining when "late" notice becomes "too late." In *Wood v. Duckworth*, 156 Mich.App. 160, 163, 401 N.W.2d 258 (1986), the court noted that, "An 18–month delay, in notifying an insurance company of a suit against its insured due to the insured's forgetfulness is not on its face a reasonable delay." In *Grand Rapids Auctions v. Hartford Accident and Indemnity Co.*, 23 Mich.App. 389, 178 N.W.2d 812 (1970), the court noted that, "Although prejudice to the rights of the insurer is a necessary element in determining if there has been unreasonable delay, a delay in giving notice of seven months, eight days has been held to be *prima facie* failure to give notice as soon as practicable." *Id.* at 385, 178 N.W.2d 812 (citing *Wehner*, 331 Mich. at 122, 49 N.W.2d 87). The majority of the cases, however, have refused to apply a presumption of unreasonable delay, and have required insurers to demonstrate actual prejudice from the insured's delay in notifying the insurer.

Aetna has tendered to the Court an affidavit from Aetna's Assistant Claim Counsel who states that Aetna has no record of receiving from Upjohn any written claims from seven sites, and untimely tender of claims from some six others. Affidavit of Cavo, at 1 (July 6, 1989).[19] In that same testimony, Cavo claims that Aetna has no record of receiving the complaint in the action involving the Berlin and Farro Liquid Incineration site, *United States v. Berlin & Farro. Id.* Aetna also has submitted evidence in order to show that Upjohn may have breached its contractual duty to provide prompt notice of the third party complaint in *C & O Railway v. Lansing Iron & Metal*, at the Barrels, Inc. site.[20]

---

sured failed to give timely notice of suit resulting in prejudice); *Steelcase, Inc. v. American Motorists*, Docket No. G-87-5553, slip. op. (W.D.Mich. Feb. 24, 1989). (Condition precedent to action against insurer under policy is compliance by insured with notice provisions) *See* Exhibit T of Defendant's Appendix.

**19.** Those sites are as follows: Butler Tunnel, Distler Farms, Lone Pine, Portage Road, Rooney, Spring Street and Seymour Recycling. Aetna has also provided evidence that PRP letters from the K.L. Avenue site, the Old Mill site, the Scientific Chemical sites, and the Thermo-Chem, Liquid Disposal, and Cork Street sites, were not forthcoming from Upjohn as required by the policies. *See id.*, at Exhibits G, H, I, J.

**20.** There is evidence here that the third party complaint was filed on October 3, 1983, but that Upjohn did not tender the suit to Aetna until March 7, 1985. *See* Defendant Aetna's Exhibit K. Defendant Aetna has not argued that plaintiffs breached any contractual duties related to conduct at the Beacon Heights or Verona Wellfield sites, the other two sites where complaints have been filed.

To begin with, none of the claims from the thirteen sites listed in note 19, *supra*, involve complaints, and I have already held that a PRP letter does not trigger a duty to defend. In the case of the Berlin and Farro site and the Barrels, Inc. site, however, I will grant summary judgment for plaintiffs on the duty to defend issue in spite of Aetna's arguments and submissions on the late notice question, because the duty to defend standard is triggered where the allegations in the complaint are even arguably within the insurance policy's protection, viewing the issue by comparing only the policy language and the allegations in the underlying proceedings, as I have already discussed. Also I will grant summary judgment in favor of plaintiffs on the duty to defend issue as to the other two sites where a complaint has been filed: Beacon Heights and Verona Wellfield. I agree with plaintiffs that Aetna's arguments here on late notice "badly miss the mark." In assessing the duty to defend, facts outside the allegations that might negate coverage are not properly considered. Moreover, the duty to defend is triggered where the allegations in the relevant complaint "even arguably" fall within the ambit of the policy language.[21] The late notice facts are thus inappropriate to a discussion of the duty to defend—they certainly go beyond the allegations and policy language. Defendant Aetna is therefore bound to defend as to the Berlin and Farro and the Barrels, Inc. sites—in spite of the late notice argument—and to the Beacon Heights and Verona Well field sites here where they have made no such argument.

GENERAL ACCIDENT

*Duty to Defend*

Given the foregoing background, I first note again that General Accident has no duty to defend Upjohn in the actions where only a PRP letter, and no complaint, has been filed.[22] In its reply brief, Upjohn acknowledged it only sought to establish General Accident's defense obligations for the Cork Street and Portage Road sites. *See* Plaintiffs' Reply Brief, at 2 n. 1 (Aug. 15, 1989). And because a complaint has not been filed at the Cork Street or the Portage Road sites, I certainly cannot find for Upjohn as a matter of law; thus its motion for partial summary judgment against General Accident here is denied.

Defendant General Accident has filed a summary judgment motion against Upjohn on the issues of the duty to defend and the duty to indemnify. This motion addresses eleven sites—of the twenty-six (26) sites, the eleven sites remaining at issue following Upjohn's early admission in its interrogatories that General Accident had no duty to defend on fifteen sites. Accordingly, defendant General Accident's motion for summary judgment in *its* favor on the duty to defend and to indemnify involves the following eleven sites, spanning six states: Auburn Road, Beacon Heights, Butler Tunnel, Cork Street, Fischer–Calo, KL Avenue, Laural Park, Portage Road, Pulverizing Services, Spring Street, and Verona Wellfield. Thus General Accident seeks a declaration that, as a matter of law, it has no duty to defend or to indemnify Upjohn at these eleven sites.

The duty to defend issue, in part, has been exhausted. Plaintiffs sought judgment in their favor *only* for the Cork Street and Portage Road sites, and I denied that request because no complaint had been filed as to either site. It is now proper for me to grant summary judgment on this basis for defendant General Accident on the duty to defend issue as to these two sites, and I will do so. Further, of the eleven sites which are the subject of General Accident's motion, seven have had no

---

**21.** In any case, as I have discussed, there is no "simple rule" for determining whether notice is "too late" under Michigan law. *Steelcase, Inc. v. American Motorists Insurance Co.,* No. G87–533, slip op. at 10 (W.D.Mich. Feb. 24, 1989). Even excessive delay will not preclude coverage unless the insurer can demonstrate actual prejudice. *Id.* The question of prejudice is one of fact. *Henderson v. Biron,* 138 Mich.App. 503, 360 N.W.2d 230, 232 (1984).

**22.** General Accident only insured Upjohn, not Asgrow Company, thus Asgrow is not the subject of these motions.

complaint filed, thus there is no duty to defend.

The remaining two sites, where complaints have been filed, are at Beacon Heights and Verona Wellfield. The Beacon Heights landfill is located in North Haven, Connecticut. General Accident's policy terminated in January 1956 while Upjohn did not purchase the North Haven facility until 1962. *See* Defendant General Accident's Exhibit 1, at 5 (Answer to Interr. 4). Thus I conclude that Upjohn did not have any involvement with the Beacon Heights landfill prior to the time the policy was terminated. As a matter of law, General Accident has no duty to defend Upjohn as to the Beacon Heights site.

 As to the Verona Wellfield site, defendant General Accident argues that the plain terms of its accident policy precludes any finding of a duty to defend in these circumstances. The accident policy issued by General Accident states, as follows:

> Coverage C—Property Damage Liability—Except Automobile. To pay on behalf of the insured all sums which the insured shall become legally obligated to pay by reason of the liability imposed upon him by law, or the liability of others assumed by him under contract for damages because of injury to or destruction of property, including the loss of use thereof, caused by accident excepting accidents arising out of the ownership, maintenance or use of any automobile.

The crux of General Accident's argument here is that "accident" is a much narrower term than "occurrence", and by no means could one reasonably interpret the conduct charged in the CERCLA complaints as an accident. In this context, however, the terms are functional equivalents, and because of this, an accident policy such as the one before me triggers a duty to defend, as does an occurrence policy. *See U.S. Fidelity and Guaranty Co.*, 683 F.Supp. at 1171. I will deny General Accident's motion to grant judgment in its favor on the duty to defend issue as to the Verona Wellfield site.

*Duty to Indemnify*

On the duty to indemnify issue, I observe first that General Accident's two policies contain conditions precedent requiring Upjohn to notify the insurer in the event of an accident or occurrence and where any suit or claim is made against Upjohn. The notice provisions in the "Conditions" portion of the policies read in pertinent part:

> **Notice of Accident or Occurrence.** In the event of accident or occurrence, written notice shall be given by or on behalf of the insured to the company or any of its authorized agents as soon as practicable. Such notice shall contain particulars sufficient to identify the insured and also reasonably obtainable information respecting the time, place and circumstances of the accident or occurrence, the names and addresses of the injured and of available witnesses.
>
> **Notice of Claim or Suit.** If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative.

*See* General Accident's Brief in Support, at 1 (Dec. 13, 1989).

The policies also set forth the agreed consequences of the insured's failure to comply with the terms and conditions of the policies. That language reads as follows:

> **Action Against Company.** No action shall lie against the company unless, as a condition precedent thereto, the insured shall have fully complied with all the terms of this policy, nor until the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured or actual trial or by written agreement of the insured, the claimant and the company.

*See id.*

As Appendix B illustrates, Upjohn received notice of either an "occurrence" or a "claim or suit" at various times in the 1980's, and gave their insurer General Accident notice of the occurrences and claims or suits in April 1988. The time elapsed between the relevant policy event and no-

tice thus ranged from two months (Fisher–Kalo site) to some five years (Portage Road site). Under Michigan law, late notice to the insurer is not a defense to coverage unless the insurer can demonstrate that it has been prejudiced by the delay. *West Bay Exploration Co. v. International Surplus Lines Insur. Co.*, No. G87–870 (W.D.Mich. Sept. 20, 1989); *Steelcase, Inc. v. American Motorists*, No. G87–553 (W.D.Mich. Feb. 24, 1989); *Wendel v. Swanberg*, 384 Mich. 468, 185 N.W.2d 348 (1971); *Wehner v. Foster*, 331 Mich. 113, 117, 49 N.W.2d 87 (1951); *Kennedy v. Dashner*, 319 Mich. 491, 494, 30 N.W.2d 46 (1947); *Wood v. Duckworth*, 156 Mich.App. 160, 163, 401 N.W.2d 258 (1986); *Burgess v. American Fidelity Fire Ins. Co.*, 107 Mich.App. 625, 628, 310 N.W.2d 23 (1981); *Kermans v. Pendleton*, 62 Mich.App. 576, 581–82, 233 N.W.2d 658 (1975).

As I have previously stated, there is no simple rule under Michigan law for determining when "late" notice becomes "too late." In *Wood v. Duckworth*, 156 Mich.App. 160, 163, 401 N.W.2d 258 (1986), the court noted that, "An 18–month delay in notifying an insurance company of a suit against its insured due to the insured's forgetfulness is not on its face a reasonable delay." In *Grand Rapids Auctions v. Hartford Accident and Indemnity Co.*, 23 Mich.App. 389, 178 N.W.2d 812 (1970), the court noted that, "Although prejudice to the rights of the insurer is a necessary element in determining if there has been unreasonable delay, a delay in giving notice of seven months, eight days has been held to *prima facie* failure to give notice as soon as practicable." *Id.* at 395, 178 N.W.2d 812 (citing *Wehner*, 331 Mich. at 122, 49 N.W.2d 87). The majority of the cases, however, have refused to apply a presumption of unreasonable delay, and have required insurers to demonstrate actual prejudice from the insured's delay in notifying the insurer.

 Furthermore, the law on late notice suggests that in determining whether prejudice has occurred, courts have considered whether the delay prevented the insurer 1) from adequately investigating the accident or occurrence, *see Wehner*, 331 Mich. at 122, 49 N.W.2d 87; *Kermans*, 62 Mich.App. at 582, 233 N.W.2d 658; 2) from participating in settlement negotiations, *Kermans*, at 582, 233 N.W.2d 658; *Bibb v. Dairy Land Insurance Co.*, 44 Mich.App. 440, 446, 205 N.W.2d 495 (1973); or 3) from protecting its rights to pursue claims against third parties, *Grand Rapids Auctions*, 23 Mich.App. at 395, 178 N.W.2d 812. Courts have also considered whether the insurer, after receiving late notice, acted promptly to protect its interests and those of its insured. *See Burgess*, 107 Mich.App. at 629–30, 310 N.W.2d 23; *Bibb*, 44 Mich.App. at 446, 205 N.W.2d 495.

Prejudice has been found where an insured has admitted liability, consented to judgment or made damaging admissions prior to notifying the insurer. In *West Bay*, No. G87–870, at 12–13, late notice to the insurers precluded them from investigating events alleged to have caused contamination. The insured also consented to clean-up and abatement as ordered by the DNR. In *Steelcase*, No. G87–553, at 19, the plaintiff had consented to the entry of a cleanup and abatement order by the California Regional Water Quality Control Board ("CRWQCB"). Although Steelcase's liability was strict and it had no alternative but to act promptly in order to minimize the environmental damage, the court found that Steelcase's insurers, who had been notified of the problem, were prejudiced by this action. Noting that the insurers had no opportunity for any input in the decision about how cleanup was to proceed, the court found prejudice. In *Wood v. Duckworth*, 156 Mich.App. 160, 401 N.W.2d 258, the court found that prejudice had occurred where the insured delayed notice for eighteen months, notifying his insurance company only three weeks before the matter at issue was to go to trial. In addition, during the course of litigating the matter, the insured had essentially admitted his liability and made several inculpatory admissions, leaving the insurer with "almost certain liability [and] little opportunity to control the direction of the legal proceedings." *Id.* at 163, 401 N.W.2d 258. In *Kermans*, 62 Mich.App. 576, 233 N.W.2d 658, the

court found prejudice where the insured delayed notice for almost three years and had consented to a judgment in the underlying lawsuit. The court found that the delay caused prejudice because it prevented the insurance company from conducting a physical examination of the injured party, from determining whether an affirmative defense was available and from participating in the settlement negotiations.

Prejudice has also been found where the delay prevented an appropriate investigation of the accident at issue. In *Steelcase*, No. G87–553, at 18–19, the insurers first received notice of the spill more than two years after it had occurred. At that time, Steelcase had already spent hundreds of thousands of dollars, and obligated itself to a particular cleanup process. The storage tank involved in the spill had been removed and a pipe which had been involved had been left in the ground, exposed to the elements and deterioration. The court found that Steelcase's delayed notice prejudiced the insurer's ability to investigate the claim.

In *Wehner*, 331 Mich. 113, 49 N.W.2d 87, the court found prejudice where the insured delayed notice seven months and lost a lawsuit filed by the injured person. The insurer established that, had it been given timely notice, it would have investigated the incident and attempted to settle the case with the injured party. *Id.* at 118–19, 49 N.W.2d 87. Because the delay prevented this investigation, the court found prejudice. *Id.* at 122, 49 N.W.2d 87.

Similarly, in *Grand Rapids Auctions*, the court found that prejudice could be established where the insured delayed in notifying its insurer of a loss covered by an employee fidelity bond for approximately eight months. "The delay in this case deprived defendant of the opportunity to investigate so that the misapplied property might be recovered or the employee proceeded against." *Id.*, 23 Mich.App. at 395, 178 N.W.2d 812. Because there was a dispute regarding when the insured received adequate information to submit a claim, the court found that the question of prejudice was one for the jury to decide.

Finally, in *Motor State Insurance Co. v. Benton*, 35 Mich.App. 287, 192 N.W.2d 385 (1971), the court found prejudice where an insured delayed notice for over two years, because the delay prevented the insurance company from independently investigating the accident at issue. The insured had hired an attorney who investigated the accident, but the court rejected an argument, raised by Judge O'Hara in dissent, that the availability of this investigative report negated any prejudice suffered.

In a number of cases, courts have refused to accept insurer's claims of prejudice. In *Kennedy v. Dashner*, 319 Mich. 491, 30 N.W.2d 46 (1947), the insurer received notice from the injured party's counsel 47 days after the accident occurred. Its insured refused to attend the trial. The court found no prejudice because the insurer had access to a police report describing the accident and because the insured's presence at trial would not have assisted the insurer since his son was driving the car at the time of the accident. *Id.* at 494, 30 N.W.2d 46.

In *Wendel v. Swanberg*, 384 Mich. 468, 185 N.W.2d 348 (1971), the court found no prejudice, although the insured failed to notify her insurer of the pendency of a suit until after a default judgment was entered against her. In that case, the insurer received notice of the accident itself within four months of its occurrence. The insurer conducted an investigation and made a settlement offer to the injured party before suit was filed. Finally, the jury found that the insured had forwarded the suit papers to the insurer four months after the suit was filed, although the papers were not found by the insurer until sometime later. Under these circumstances, the court held that it was not error to submit the question of prejudice to the jury.

In *Burgess v. American Fidelity Fire Insurance Co.*, 107 Mich.App. 625, 310 N.W.2d 23 (1981), the court also found that delayed notice did not prejudice an insurer. In that case, the insured was involved in an automobile accident in May, 1975. The injured party's attorney spoke with the insurer on several occasions prior to filing suit.

The injured party sued the insured and obtained a default judgment against her on June 17, 1977. On August 31, 1977, the insurer was notified of the default judgment. The insurer did not move to set aside the default until November 4, 1977. When that motion was denied, it waited another four months to file a motion for rehearing. Although the court conceded that the delayed notice may have prejudiced the insurer's ability to investigate the claim, it found this prejudice to be immaterial, in light of the insurer's failure to act promptly when the judgment was discovered.

> The insurance carrier will not be permitted to benefit by sitting idly by, knowing of the litigation, and watch its insured become prejudiced.... [P]rejudice [to the insurer] does not become material where the carrier, upon notice, does not act or properly act to protect its interest or that of its insured. Such prejudice was not attributable, in the ultimate sense, to the insured's failure to give notice of suit, but rather to the insurance carrier's failure to act upon receiving notice.

*Id.* at 630, 310 N.W.2d 23.

A similar result occurred in *Bibb v. Dairyland Insurance Co.,* 44 Mich.App. 440, 205 N.W.2d 495 (1973). In that case, the insured was involved in an accident on July 14, 1968 and promptly notified the insurer of that event. The insurer entered into settlement negotiations with the injured party. The injured party filed suit in July 1969 and obtained a default judgment against the insured in January 1970. The defendant insurance company learned of the suit in April 1970 and was served with a garnishment action in August of that year. The court refused to find that the insurance company was prejudiced by late notice of the suit:

> No evidence even suggests that defendant was prevented from making a timely investigation of the accident in order

to evaluate claims or to defend against fraudulent, invalid or excessive claims. Indeed, it is reasonable to assume that a thorough investigation was a necessary requisite prior to entering into negotiations for a settlement of the claim.

*Id.* at 446, 205 N.W.2d 495.

█ In sum, after reviewing the parties' arguments, the extensive discussion on a late notice defense, and the background facts, *see* Appendix B, I find that defendant General Accident is entitled to judgment as a matter of law on the duty to indemnify issue as to the Beacon Heights and Portage Road sites. I will deny the motion as to all other sites, because the issue of notice and prejudice raise genuine issues of material fact. As I discussed earlier, the policy Upjohn negotiated with General Accident terminated no later than 1956, while Upjohn did not acquire the Beacon Heights site until 1962. Upjohn has not produced any evidence or legal argument in opposition to this argument, and I find that summary judgment is appropriate here in favor of General Accident.

█ At Portage Road, Upjohn had notice of an occurrence as early as 1983 when it learned of the test results produced by the Michigan Department of Natural Resources. Upjohn therefore let approximately five years go by before it notified its insurer, General Accident, of the occurrence referred to in its policy. Moreover, it is undisputed that Upjohn entered a consent decree with other potentially responsible parties in 1986 before it ever notified General Accident. While Upjohn argues that it entered into a compliance agreement and committed the company merely to *"investigate"* and *"evaluate"* remedial options (and not to remediate), in the context of the other egregious facts concerning the Portage Road site, I cannot distinguish this case on this factor alone in light of *West Bay* and *Steelcase.*[23]

---

**23.** In addition, I am not sure that evaluative work represents a financial obligation independent of a remedial plan. Upjohn's remediation expenses, if it performs clean-up procedures, will presumably be lessened because of the evaluation it has already performed and the information it has already gathered. I cannot see how it would attempt clean-up without spending evaluation dollars. Thus, to some extent, Upjohn has taken on financial obligations over which its insurer had no control, a factor looked upon with disfavor by the courts deciding this type of issue.

And, as in the cases this Court had previously decided, General Accident was precluded from investigating the source, extent, and degree of the environmental contamination. It therefore lost its opportunity to participate and potentially influence the compliance agreement; to initiate third party claims; and to contribute its voice as to the precise procedures that would be employed at this site. Upjohn argues that General Accident has offered no evidence suggesting that the dollars the company committed to spend on evaluation were "likely to increase" the ultimate exposure at Portage Road. I am willing, however, under these facts, to make the inference from those lost opportunities that prejudice existed, as I have previously decided—the prejudice being the inability to suggest or demand more efficient or less costly procedures and to interject litigation strategies concerning the settlement proceedings or potential third party actions.

Finally, Upjohn contends that its insurer has failed to show that evidence from Portage Road "was destroyed", the implication being that if there was no destruction of evidence, there could be no prejudice. Yet, again, the inference from the evidence General Accident *has* provided suggests alteration of evidence: certainly the Portage Road site has been altered over the years by the procedures undertaken by the various parties, and, one assumes, by the passage of such a significant period of time.[24]

## CONCLUSION

In sum, I will grant plaintiffs' motion against defendant Aetna for partial summary judgment on the duty to defend issue as to the Barrels, Inc., Beacon Heights, Berlin & Farro, and Verona Wellfield sites where complaints have been filed, but deny it as to the remaining sites where no complaints have yet been filed. I will deny plaintiffs' motion against defendant General Accident for partial summary judgment on the duty to defend as to the Cork Street and Portage Road sites where complaints have not been filed.

Further, on the duty to defend issue, I will grant General Accident's motion for partial summary judgment as to the Cork Street and Portage Road sites. As to the seven sites where no complaint has been filed (Auburn Road, Butler Tunnel, Fischer–Kalo, KL Avenue, Laural Park, Pulverizing Services, Spring Street), there being no duty to defend, I will grant defendant General Accident's motion for partial summary judgment as well. General Accident has no duty to defend Beacon Heights, thus its motion for partial summary judgment is granted. I will deny General Accident's motion on the duty to defend issue as to the Verona Wellfield site.

Finally, on General Accident's motion for partial summary judgment on the duty to indemnify issue, the motion is granted as to the Beacon Heights and Portage Road sites, and denied as to the remaining sites.

## APPENDIX A *

| Site | PRP Filed? | Response Costs | Insurer on Risk [1] |
| --- | --- | --- | --- |
| Auburn Road | No | No | A |
| Bay Drums | Yes | Yes | A |
| Barrels, Inc. | No, but Complaint | Yes | A [2] |

---

24. These facts also suggest that any decision by the insurer not to take investigative or other action at Portage Road *once it received notice* was justified because General Accident could not, at such a late date, take advantage of the lost opportunities.

* This Appendix covers the period of time during which the pleadings on these motions were filed. Some update, according to the principles articulated within this opinion, may well be necessary.

| Site | PRP Filed? | Response Costs | Insurer on Risk [5] |
|---|---|---|---|
| Beacon Heights | Yes, and Complaint | Yes | A [3] |
| Berlin & Farro | Yes, and Complaint | Yes | A [4] |
| Butler Tunnel | Yes | Yes | A |
| Chemical Control | Yes | Yes | A |
| Cork Street | Yes | Yes | GA and A |
| Distler Farm and Brickyard Sites | Yes | Yes | A |
| Fisher–Calo Chemical | Yes | Yes | A |
| KL Avenue Landfill | Yes | Yes | A |
| Kin–Buc Landfill | Yes | Yes | A |
| Laural Park | No | No | A |
| Liquid Disposal, Inc. | Yes | Yes | A |
| Lone Pine Landfill | Yes | Yes | A |
| Maxey Flats Nuclear Disposal | Yes | Yes | A |
| Melton Avenue Site | Yes | Yes | A |
| Old Mill Hazardous Waste Site | Yes | Yes | A |
| Portage Road | No | Yes | GA and A |
| Pulverizing Services Inc. | Yes | Yes | A |
| Rooney Property | No | No | A |
| Scientific Chemical Processing Facilities | Yes | Yes | A |
| Seymour Recycling Site | Yes | Yes | A |
| Spring Street Site | No | Yes | A |
| Thermo Chem | Yes | Yes | A |
| Verona Wellfield | No, but Third Party Complaint | No | A [6] |

[1] There is no dispute that from at least December 31, 1947, to January 1, 1956, Upjohn was covered by CGL policies issued to it by General Accident (*see* General Accident Answer at ¶ 8) and that from January 1, 1956, to September 30, 1986, Upjohn was covered by CGL policies issued to it by Aetna (*see* Aetna Answer at ¶ 9). The Appendix reflects Upjohn's rather belated acknowledgement that it "seeks now to establish General Accident's defense obligation *only* with regard to the Cork Street and Portage Road sites." Originally, Upjohn sought a declaration on the duty to defend against General Accident for other sites including KL Avenue, Beacon Heights, Laural Park, Pulverizing Services, Spring Street, and Verona Wellfield. Upjohn's Reply Brief, at 2 n. 1 (Aug. 15, 1989).

[2] Aetna is defending under reservation of rights.

[3] Aetna is defending, but the complaint has allegedly not yet been tendered to the insurer.

[4] Complaint tendered, but no request for defense costs post-consent decree.

[5] There is no dispute that from at least December 31, 1947, to January 1, 1956, Upjohn was covered by CGL policies issued to it by General Accident (*see* General Accident Answer at ¶ 8) and that from January 1, 1956, to September 30, 1986, Upjohn was covered by CGL policies issued to it by Aetna (*see* Aetna Answer at ¶ 9).

[6] Aetna is defending under reservation of rights.

## APPENDIX B

| Site [1] | Date Upjohn Received Notice of Occurrence/Claim [2] | Date Upjohn Gave GA Notice | Time Elapsed Year/Month | Agreement Entered by Upjohn? |
|---|---|---|---|---|
| Auburn Road | 6/25/86 PRP Letter | 4/18/88 | 22 Mos | No |
| Beacon Heights | 3/26/85 and EPA Proceeding; PRP Letter<br><br>7/22/87 Complaint | 4/18/88 | 3 Yr/1 Mo. | Yes, 1987 Consent Decree with other PRPs |
| Butler Tunnel | 5/30/86 EPA Adm. Proceeding; PRP Letter | 4/18/88 | 1 Yr/11 Mos. | No |
| Cork Street | 1/08/87 Adm. Proceeding; PRP Letter | 4/18/88 | 1 Yr./3 Mos. | No |
| Fisher–Calo | 2/03/88 EPA Adm. Proceeding; PRP Letter | 4/18/88 | 2 Mos. | No |
| KL Avenue | 4/29/85 EPA Adm. Proceeding; PRP Letter | 4/18/88 | 3 Yrs. | No, Informal, Preliminary Discussion Only |
| Laural Park | 9/29/87 EPA Adm. Proceeding; PRP Letter | 4/18/88 | 7 Mos. | No |
| Portage Road | 1983 Occurrence; MDNR Test Results | 4/18/88 | Approx. 5 Yrs. | Yes, 1986 Compliance Agreement with MDNR |
| Pulverizing Services | 12/17/87 EPA Adm. Proceeding; PRP Letter | 4/18/88 | 4 Mos. | No |
| Spring Street | 10/85 Occurrence; Test Results | 4/18/88 | 2 Yrs./6 Mos. | No |
| Verona Wellfield | 10/02/87 Third Party Complaint | 4/18/88 | 6 Mos. | No |

[1] These eleven sites are the subject of defendant General Accident's December 13, 1989 motion for summary judgment on the late notice issue.

[2] *See* Defendant General Accident's Brief in Support, Exhibits I (1)–(10) (Dec. 13, 1989); Plaintiff Upjohn's Reply Brief, Exhibit G (Feb. 5, 1990) The insured's obligation under its policies required it to give notice "as soon as practicable" of any "accident or occurrence" and to "immediately forward" every "demand, notice, summons, or other process" received.

## ON MOTION FOR RECONSIDERATION

This case comes before the Court on three motions: 1) plaintiffs' motion for reconsideration filed June 15, 1990; 2) defendant Aetna's July 27, 1990 appeal from the Magistrate's July 13, 1990 Order; and 3) defendant Aetna's October 16, 1990 appeal from the Magistrate's October 2, 1990 Order.

The underlying lawsuit is a dispute as to insurance policy coverage for costs arising out of environmental damage suits and administrative actions in which one or both of the insured plaintiffs (Upjohn and its subsidiary) is a party or a potential party.

### I. Plaintiffs' Motion for Reconsideration

Plaintiffs filed a motion for the Court to reconsider its Opinion and Order entered June 4, 1990. In particular, plaintiffs object to the Court's conclusion that, under Michigan law, correspondence from a federal or state administrative agency identifying the insured as a potentially responsible party for environmental damage, commonly known as a "PRP letter," does not constitute a "suit," which would trigger an insurer's duty to defend pursuant to the terms of its comprehensive liability policies. The Court's authority for reconsidering its Orders and Opinions is found in Federal Rules of Civil Procedure 60.

### A. Standard

■ Federal Rules of Civil Procedure 60(b) gives the Court discretion to "entertain an independent action to relieve a party from a judgment, order, or proceeding." Courts may vacate a judgment "whenever that action is appropriate to accomplish justice." 11 C. Wright & A. Miller, *Federal Practice and Procedure*, § 2864, at 211–12 (1973) (citing *Klapprott v. United States*, 335 U.S. 601, 614–15, 69 S.Ct. 384, 390, 93 L.Ed. 266 (1949)). Usually, the court grants motions under Rule 60(b) when the judgment was obtained by a party's improper conduct or by an excusable default, *id.* at 213 (citing *U.S. v. Cato Bros., Inc.*, 273 F.2d 153, 157 (4th Cir.1959)), or in other

"extraordinary circumstances." *Ackermann v. United States*, 340 U.S. 193, 199, 71 S.Ct. 209, 212, 95 L.Ed. 207 (1950); *United States v. Cirami*, 563 F.2d 26, 32 (2d Cir.1977). The movant must file the motion in a timely fashion. *Id.* The Court should only grant this motion in extraordinary circumstances or under circumstances imposing "extreme hardship" because of the strong interest in finality of judgments. *Cirami*, 563 F.2d at 33 (citation omitted).

### B. Discussion

I deny plaintiffs' motion for reconsideration because they have demonstrated no extraordinary reasons for the Court to rethink its decision on the issue of what constitutes a "suit" under Michigan law. The Michigan Supreme Court has not addressed the issue in this particular context, although since the Court's Opinion, the supreme court granted leave to appeal on this issue in *Polkow v. Citizens Ins. Co.*, 435 Mich. 862 (1990).

■ The Court fully analyzed case law precedent on this issue, both within Michigan and in other courts around the country. The Court decided to adopt the rationale of an unreported Michigan appellate court opinion, *City of Evart v. Home Ins. Co.*, No. 103621 (Mich.Ct.App. April 10, 1990), rather than to follow the route chosen by another appellate panel in a reported opinion, *Polkow v. Citizens Ins. Co.*, 180 Mich.App. 651, 447 N.W.2d 853 (1989). As defendant pointed out, this Court is not bound by Michigan's intermediate courts in determining state law pursuant to *Erie*, but rather must make an independent analysis of how the Court believes the state's highest court would rule were it deciding this issue. *Grantham and Mann v. American Safety Prods.*, 831 F.2d 596, 608–09 (6th Cir.1987). Under the Michigan Court rules, unreported decisions are not binding precedent. Mich.Ct.R. 7.215(C)(1). Obviously, however, a court can choose to adopt a court's rationale applied in an unreported opinion.

For these reasons, plaintiffs' motion for reconsideration is denied.

## II. Appeal of Magistrate's July 13th Order

Defendant Aetna appeals from the Magistrate's Order, issued pursuant to 28 U.S.C. § 636(b)(1)(A) (1988), in which the Magistrate determined that at least some of Aetna's communications with Upjohn's former employees concerning the subject matter of this litigation were unethical.

Aetna's lawyers hired an investigation firm to, at least in part, interview former employees of Upjohn to disclose more information about the environmental damages that are the underlying subject matter of the dispute. Based upon four former employees' affidavits and Aetna's testimony, the Magistrate found that "investigators Slowik and Crochet did not determine if the former employees were represented by an attorney, clearly identify themselves as working for attorneys who were representing a client who was involved in litigation against Upjohn, nor adequately state the purpose of the interview." Order and Opinion, July 13, 1990 (Order), at 2.

The Michigan Supreme Court issued an Informal Opinion, CI–597, under the prior governing rules of ethics, the Code of Professional Responsibility (Code),[1] which relates to this issue. The Informal Opinion provides that when a lawyer communicates with an adverse corporation's former employees, who are potential witnesses, the lawyer should at the outset: 1) determine that the former employee is not a party to the action; 2) determine that the former employee is not represented by an attorney; 3) identify himself or herself as an attorney for a party opposing the former employer in pending litigation; and 4) state the purpose of the communication. Informal Ethics Opinions, CI–597, *reprinted in* State Bar of Michigan, *Professional and Judicial Ethics Opinions, Mich.Bar J.,* Nov.1988, at 70. The guidelines set forth in the Informal Opinion are entirely consistent with the duty established by the new Michigan Rules of Professional Conduct (Rules), Rule 4.3 in particular. Lawyers are advised that the requirements un-der Rule 4.3 arise especially, but not only, when a lawyer contacts an unrepresented person without experience in dealing with legal matters. Rule 4.3 Comment.

The Magistrate found that the investigators hired by Aetna's lawyers had misled Upjohn's former employees and had not followed the guidelines established in the Informal Opinion. Reasoning that "ethical considerations are as applicable to representatives of lawyers as to lawyers themselves," the Magistrate concluded that the Court should not allow Aetna to benefit from the information that was improperly obtained. Order at 2–3. As a result of the investigators' conduct, the Magistrate ordered the following: 1) Aetna must submit the names of all former employees with whom Aetna, through its representatives, has communicated; 2) Aetna must submit a detailed summary of the communications, including their date, time, place, and substance; 3) any evidence obtained by Aetna from the ex parte interviews is not admissible at trial; and 4) Aetna may not interview any former employee without first delivering the employee a detailed letter, which among other things, describes the purpose of the interview. Order at 3. Aetna proposes that the Court modify the Magistrate's Order so that Aetna must only: 1) completely disclose all information regarding the communications that have been made with former employees; and 2) in the future, instruct its investigator to read, at the beginning of each interview with a former employee, a relatively brief letter which, among other things, describes the purpose of the interview. Brief in Support at 10.

### A. Standard

Pursuant to statute, this Court may reconsider any pretrial matter "where it has been shown that the magistrate's order is clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A) (1988); *see also* Federal Rules of Civil Procedure 72(a) (district court shall modify or set aside any portion of magistrate's order on a non-dispositive matter found to be clearly erroneous or

---

1. The Michigan Code of Professional Responsibility (Code) was replaced by the Michigan Rules of Professional Conduct (Rules), adopted effective October 1, 1988.

contrary to law). "If the motion would not dispose of a claim or defense, the magistrate may enter a final decision reviewable only for clear error." 7 J. Moore, J. Lucas & K. Sinclair, *Moore's Federal Practice* § 72.02[3], at 72–13 (1990). In reviewing such objections, the Court must give "considerable deference" to the magistrate's order. *Id.* § 72.03[7.–3], at 72–42.

## B. Discussion

Defendant first states that "[t]his appeal is based on the assumption that no affirmative misrepresentations were made by Harrison/Kroll investigators." Defendant's Brief in Support at 1. I interpret this statement to mean that defendant argues that the investigators did not intentionally mislead the former employees. The Magistrate made it quite clear that he did not make such a finding of fact. The Magistrate did not determine whether the conduct at issue was intentional or unintentional. The Magistrate expressly stated in Court that he "could not find that the conduct here was inadvertent." Hrg. at 41. In his Opinion and Order, the Magistrate stated that "[w]hether the guidelines were intentionally disregarded or not, the conduct of the investigators misled at least some of Upjohn's former employees who were interviewed." Opinion and Order, July 13, 1990, at 2–3. In effect, the Magistrate ruled that the presence of intent is not determinative as to whether the investigators' conduct was unethical. Therefore, in reviewing the Magistrate's Order, the Court will presume that the investigators' misrepresentations may have been inadvertent.[2]

Defendant appeals from the Order on the basis of four arguments. I find that defendant has failed to show that the Magistrate's Order was clearly erroneous or contrary to law.

*1. Vicarious Liability under the Rules of Professional Conduct*

■ Defendant first objects to the Magistrate's Order because it was based on a finding that the conduct of the investigators hired by Aetna violated the Michigan Rules of Professional Conduct (Rules). Defendant argues that this finding "amounts to a determination that the Rules impose blanket vicarious liability on a lawyer for any alleged misconduct by agents." Defendant states, "The Rules ... were [never] intended to regulate the conduct of agent investigators." Brief in Support at 10.

Rule 5.3 provides guidelines governing lawyers' use of nonlawyer assistants.[3] The Rule states in relevant part that "a lawyer ... shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer." The lawyer "shall be responsible for conduct of such a person that would be a violation of the rules ... if engaged in by a lawyer" if the lawyer orders, ratifies, or knows of the conduct at a time when the consequences could be "avoided or mitigated but fails to take remedial action." Rule 5.3.

Rule 4.3 governs a lawyer's contacts with a person not represented by an attorney. The Rule provides:

"In dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested. When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding."

Rule 4.3. The official Comment warns that an "unrepresented person, particularly one not experienced in dealing with legal matters, might assume that a lawyer is disinterested in loyalties or is a disinterested authority on the law even when the lawyer represents a client." Rule 4.3 Comment.

First, in so far as the Rules attempt to set standards by which lawyers instruct

---

2. This presumption is for the purposes of this motion only and has no bearing on the final resolution of this case on its merits.

3. There is no evidence showing that the investigators whose conduct is at issue were lawyers.

and supervise the conduct of their nonlawyer employees, the Rules indirectly provide standards for nonlawyer assistants. A lawyer should try to ensure that nonlawyer assistants act in accordance with the Rules of Professional Conduct. If the nonlawyer assistant's conduct falls short of these standards, the Rules state that the lawyer may be responsible only under circumstances when the lawyer ordered, ratified, or knew of the conduct in time to avoid or mitigate the detrimental effects.

Defendant argues that Aetna's lawyers cannot be held vicariously liable for the conduct of the nonlawyer investigators in this case because the lawyers did not order, ratify, or timely know of the investigators' conduct. In the absence of a showing of vicarious liability, defendant argues that the Rules should not apply at all to the conduct of the nonlawyer investigators Aetna hired. Thus, defendant argues, the Magistrate's application of the Rules to the conduct at issue here is clearly erroneous and contrary to law. Order at 3.

I disagree. There is simply no support for the proposition that the Magistrate's application of ethical rules governing state legal disciplinary hearings to the conduct of nonlawyer investigators hired by lawyers to gather information for their client's case is either clearly erroneous or contrary to law. Indeed, there is considerable support, although no binding precedent, for application of the rules to nonlawyers hired by lawyers to collect evidence from former employees of an adverse corporation. *See e.g., Public Serv. Elec. and Gas Co. v. Associated Elec. & Gas Ins. Servs., Ltd.,* 745 F.Supp. 1037 (D.C.N.J.1990) (pursuant to Rule 4.2, investigator hired by lawyers may have no informal contact with former employees who are represented by attorney); *Massa v. Eaton Corp.,* 109 F.R.D. 312 (W.D.Mich.1985) (pursuant to Michigan Code of Professional Responsibility, neither plaintiffs nor their counsel could conduct informal interviews with managerial employees of adverse corporation); *Nat'l Union Fire Ins. Co. v. Stauffer Chemical Co.,* C.A. No. 87C–SE–11, 1990 WL 140430 (Del.Super.Ct. Sept. 10, 1990) (investigators' conduct violated Rules of Professional Conduct) (Order); *Monsanto Co. v. Aetna Casualty and Surety Co.,* 593 A.2d 1013 (Del.Super.Ct.1990) (investigators' conduct violated Rules of Professional Conduct) (Order).

The Michigan Rules of Professional Conduct are not laws, but merely establish guidelines to be used in state disciplinary proceedings. The Rules are not binding on the courts in any judicial proceeding. Rule 1.0 Preamble. Moreover, "[t]he Rules do not ... exhaust the moral and ethical considerations that should inform a lawyer, for no worthwhile human activity can be completely defined by legal rules. The rules simply provide a framework for the ethical practice of law." *Id.*

This Court is not bound by the limited scope of the Michigan Rules of Professional Conduct in determining whether nonlawyers, hired by lawyers to collect evidence from prospective witnesses to benefit the lawyers' clients, have violated the standards of ethical conduct and practice. The Magistrate made a finding that former Upjohn employees were misled by Aetna's investigators as to their loyalties in the case and as to their purpose in wanting to question them. Clearly, a lawyer may not so mislead prospective witnesses who are not represented by counsel. To allow a lawyer to hire a nonlawyer and accomplish such a deception, intentionally or unintentionally, would, as the Magistrate stated, render the ethical proscription meaningless.

The Magistrate concluded that the information obtained by the misleading investigations could not be used at trial. Suppressing the nonlawyers' work product does not necessarily mean that the lawyers hiring or supervising the nonlawyer assistants are vicariously liable. There has been no finding that Aetna's lawyers improperly guided the investigators or failed to properly instruct them. Even without such a finding, however, the Magistrate's decision to not allow introduction of the product of their investigations at trial was entirely appropriate. When a lawyer hires a nonlawyer to do his work, the lawyer must make reasonable efforts to ensure that the

nonlawyer accomplishes his task in compliance with the standards governing the conduct of lawyers. If the nonlawyer violates those standards, however, the product of the nonlawyer's work is tainted by the ethical violation, regardless of the lawyer's efforts to ensure compliance.

### 2. Reliance on Informal Opinion CI–597

Defendant next argues that the Magistrate's reliance on Informal Opinion CI–597 as the standard of ethical conduct to apply in interviews by nonlawyers with former employees of an adverse corporation was clearly erroneous and contrary to law. There is no dispute that the investigators did not comply with the guidelines set forth in CI–597. Defendant contends, however, that CI–597, which was issued pursuant to the Code of Professional Responsibility, should not be binding on the conduct at issue here.

First, defendant contends that Informal Opinions are issued for lawyers to consult as a guide for their conduct in the future. They are not intended to be used, defendant argues, as a basis for judging past conduct. Defendants state that the Magistrate's finding of unethical interviews, in so far as it was based on CI–597, therefore is clearly erroneous and contrary to law.

As defendant concedes, the Magistrate's finding is in effect a conclusion that the nonlawyer investigators violated Rule 4.3, as evidenced by the fact that the investigators did not follow the guidelines set forth in the Informal Opinion. Rule 4.3 provides that when a lawyer knows or should know that an unrepresented nonlawyer misunderstands the lawyer's role in the matter, the lawyer has a duty to attempt to clarify it. In my opinion, the Informal Opinion imposes no additional requirements, but merely spells out how the lawyer may comply with Rule 4.3.

The Magistrate concluded that "the conduct of the investigators misled at least some of Upjohn's former employees who were interviewed." Order at 2–3. In so far as the nonlawyers were acting as the agents of the lawyers and collecting evidence to benefit the lawyers' clients, the investigators violated Rule 4.3 by not taking reasonable measures, as described in CI–597 or otherwise, to clarify the situation.

One of the investigators stated that he told the former employees he was "hired by an insurance company who was being asked to pay for cleanup costs at the Portage Road facility." Hrg. at 14. In my view, this explanation, even if followed by giving the interviewee a business card, is insufficient. It does not constitute a reasonable effort to clarify any misunderstanding the former employees [4] may have had regarding the investigator's purpose and interest in the interview. The other investigator that submitted an affidavit was silent on this issue. There is no evidence that any of the investigators took further measures whatsoever to clarify their role in the matter, in the four interviews concerning which plaintiffs submitted affidavits or in any of the other interviews.[5] Defendants have submitted no affidavits or other evidence demonstrating that the investigators attempted in *any* way to determine whether the interviewee had legal representation, to clarify more fully their interest in obtaining the information, or to explain their purpose in conducting the interview. The Magistrate concluded that the former Upjohn employees were misled and that the investigators had a duty to "make reasonable efforts to correct the misunderstanding." Rule 4.3. The fact that the Magistrate used the Informal Opinion, CI–597, as evidence for a finding that defendant violated Rule 4.3 is not clearly erroneous or contrary to law.

It is true that the Magistrate construes the guidelines contained in CI–597 as "re-

---

**4.** Defendant has not demonstrated that the former employees had any legal experience or knowledge of which the investigators were aware. The investigators should have foreseen, therefore, potential misunderstandings.

**5.** Defendant alleges that the investigators have conducted approximately thirty interviews with former Upjohn employees.

quirements" and "dictates." I disagree with this construction, but do not find that it is clearly erroneous or contrary to law in the circumstances of this case where defendant has offered no evidence demonstrating reasonable efforts to comply with Rule 4.3. For those ignorant of or in noncompliance with the Rule 4.3 requirements, the CI–597 guidelines may be viewed as dictates insofar as they provide guidance for compliance with the rule.

■ Defendants next argue that CI–597 should no longer apply under the new Rules. I find this argument to be without merit. When the new Rules took effect, the State Bar of Michigan republished, under single cover, the prior Code and all the opinions rendered pursuant to the Code. Guidance was given as to the effect of the opinions under the new Rules:

> "The new Rules ... may in some instances alter the advice rendered under the Code. If no opinion has yet been rendered concerning the applicability of the Rules to the underlying question, readers should ... review[ ] the applicable Disciplinary Rule of the Code and the corresponding Michigan Rule ... [and make] a determination ... as to whether there appears to be any material change in the underlying ethical standard."

State Bar of Michigan, *supra*, at 6.

The provision of the old Code to which CI–597 related provided in relevant part that a lawyer during the course of representation must not "give advice to a person who is not represented by a lawyer, other than the advice to secure counsel, if the interests of such person are or have a reasonable possibility of being in conflict with the interests of his client." DR 7–104(A)(2). Under the official Comment to Rule 4.3, this provision is repeated word for word except that now the Comment advises that the lawyer should never give advice to an unrepresented person, regardless of conflict, except the advice to obtain counsel.

The conduct and the Informal Opinion at issue do not involve the rendering of advice by the lawyer, but rather informal contact or interviews with an unrepresented person. The provision under the Code, unlike the Informal Opinion, did not address this issue at all. The new Rule 4.3, however, does, as quoted *supra*. I find that the new Rule does not materially differ from the advice given under the Informal Opinion, CI–597, which applied to the prior Code. Both suggest that the lawyer should inquire whether a person is represented by a lawyer and should clarify misunderstandings as to the lawyer's interest and role in the matter to which the contact or communication relates. The Magistrate's use of CI–597 in finding that the interviews were improper was not clearly erroneous or contrary to law.

### 3. Reliance Upon Past Incidents of Impropriety

Defendant argues that in so far as the Magistrate relied upon the investigators' prior history of conducting improper interviews, the Order is clearly erroneous and contrary to law. The Magistrate did not cite to prior conduct at all in this Opinion. At the hearing, the Magistrate made reference to the evidence of prior misconduct only in support of his decision not to find that the investigators' conduct was inadvertent. Hrg. at 41. He did not conclude, however, that the investigators intentionally misled the former employees. Given the factual dispute as to the history of prior misconduct, I find that the magistrate's decision not to find the investigator's conduct inadvertent was not clearly erroneous or contrary to law.

### 4. Disclosure Requirement

■ Defendant's final argument is that the letter which the Magistrate requires the investigators to send the former employees prior to any contact is clearly erroneous and contrary to law because "the contents ... greatly exceed the requirements of the Rules ... and ... the requirements identified in Informal Opinion CI–597." Brief in Support at 8. I disagree.

The letter first informs the former employee that it is being sent pursuant to a federal court order to enable him/her to make an informed decision whether to con-

sent to an interview. The letter then identifies the interviewer as an investigator hired by insurers who are defendants in a lawsuit brought by the former employer, the matter about which the interview would concern, and the purpose of the interview. The letter further reiterates that the former employee has the freedom to refuse to be interviewed. Finally, the letter states that Upjohn is available for questions and will provide the former employee with a lawyer for the interview or in the event he/she is subpoenaed to testify.

Defendant attempts to persuade the Court that knowledge is inducement. Defendant contends the letter is contrary to Rule 3.4(f), which prohibits a lawyer from requesting a person, other than a client, not to voluntarily provide information to another party. Defendant supports this argument with the view that the letter "induces former Upjohn employees to refuse to be interviewed ... [and] invites former employee [sic] to retain counsel at no cost to themselves," which would then prohibit any ex parte contact.[6] I find that the letter is a clear statement defining the reader's options and does not constitute an inducement not to voluntarily provide information.

There is no evidence in this case that defendant's investigators took reasonable measures to clarify misconceptions that the investigators should have known the interviewees had. If defendant had demonstrated such efforts, the use of such a letter may not have been warranted, or the letter may not have needed to be so inclusive. However, such is not the case and I find that the Magistrate's letter is not overextensive to the extent that it is contrary to law or clearly erroneous.

### C. Conclusion

I do not find that the Magistrate's Order is clearly erroneous or contrary to law. I affirm the Magistrate's Order in all respects.

---

**6.** Rule 4.2 prohibits any communication regarding the subject of the representation with a party known to be represented by another lawyer. Defendant's argument rests on the pre-

*III. Appeal of Magistrate's
July 27th Order*

Defendant Aetna appeals from the Magistrate's Order, issued pursuant to 28 U.S.C. § 636(b)(1)(A) (1988), in which the Magistrate granted Upjohn's Rule 56(f) motion to permit a deferred response to Aetna's motion for partial summary judgment. As stated *supra,* the Court may reconsider the Magistrate's ruling on a nondispositive motion when there is a showing that the ruling was clearly erroneous or contrary to law.

Defendant argues that the Magistrate should not have ruled on Upjohn's motion because defendant was not given an opportunity to respond as required under Local Rule 29(b),[7] which requires the Court to wait for a response or the passage of ten days before rendering a decision on a non-discovery motion. Plaintiff filed the motion on September 26, 1990 and defendant received it the following day. The Magistrate issued the Order on October 1, 1990. Clearly, the Magistrate should have waited for defendant's response before entering an Order. Accordingly, I have reviewed defendant's responsive brief at this time.

 Upjohn moved for permission to defer its response to Aetna's motion for summary judgment until after resolution of its motion to compel certain documents, which Upjohn contends will raise an issue of material fact as to the "late notice" defense Aetna asserts. Summary judgment must be entered after "adequate time for discovery ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case on which that party will bear the burden of proof." *Lujan v. Nat'l Wildlife Fed'n,* —— U.S. ——, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1990). "[Courts] have criticized the practice of granting summary judgment motions at a time when pertinent discovery requests re-

sumption that the former employees would be deemed parties.

**7.** Local Rules of the United States District Court for the Western District of Michigan.

main unanswered by the moving party." *Oksanen v. Page Memorial Hosp.*, 912 F.2d 73, 78 (4th Cir.1990). Furthermore, summary judgment is generally inappropriate when the party opposing the motion has been unable to obtain responses to his discovery requests. *Id.; Snook v. Trust Co. of Georgia Bank of Savannah*, 859 F.2d 865 (11th Cir.1988).

The decisions whether the additional discovery can be accomplished and whether the materials represent a genuine issue of material fact which would defeat defendant's motion for summary judgment are not for the Court to decide at this juncture. Merely the fact that the materials sought to be discovered may defeat the motion for summary judgment constitutes reason to grant Upjohn's motion to defer its response until resolution of the discovery requests. Accordingly, I find that although the Magistrate should have waited for defendant's response before issuing the Order, the Order itself is not clearly erroneous or contrary to law. For this reason, the Magistrate's Order is affirmed and defendant's appeal is denied.

### ORDER

In accordance with the opinion entered this date;

IT IS HEREBY ORDERED that plaintiffs' motion for reconsideration filed June 15, 1990 is DENIED;

IT IS FURTHER ORDERED that the Magistrate's Order of July 13, 1990 is AFFIRMED;

IT IS FURTHER ORDERED that defendant Aetna's July 27, 1990 appeal from the Magistrate's Order is DENIED;

IT IS FURTHER ORDERED that the Magistrate's Order of October 2, 1990 is AFFIRMED;

IT IS FURTHER ORDERED that defendant Aetna's October 16, 1990 appeal from the Magistrate's Order is DENIED.